Mrs. Harriet Fort, Wife, &c., *v.* Union Bank of Louisiana.

*Facts:*—Not creating legal subrogation.   Code, 2157.
Where there is no price there is no sale.
C. C. 2439, 2440.

APPEAL from the Second District Court of New Orleans, *Lea*, J.
      *Elmore & King*, for plaintiff.   *Denis*, for defendant.   *R. H. Marr*, for executor, appellant.

Voorhies, J.   The plaintiff claims the ownership of 230 shares of the capital stock of the Union Bank of Louisiana, alleging that she acquired the same by purchase under an execution issued on a judgment in her favor against her husband, *F. M. Hereford*, and prays to be recognized as such owner.

As no appeal has been taken from the judgment rendered by the court below, between the plaintiff and the bank, it is therefore unnecessary to notice the issues raised by the action of the latter.   It is proper, however, to observe, that whatever may be the result of the controversy between the other litigating parties, the interest of the bank, as settled by that judgment, cannot be affected.

The executor of the late *James McCalop*, as intervenor, alleges that *F. M. Hereford* is indebted to the estate of the testator in the sum of $2379 84 with interest, according to the charter of the Union Bank, from the 26th of January, 1844, until paid, balance due on a promissory note of $3400, given by him to said bank for a loan on the 23d of December, 1842, and payable twelve months after date to the order of and endorsed by *J. B. Hereford* to *John L. Lobdell*, and by the latter also endorsed; that in order to secure the loan thus obtained by him, *F. M. Hereford* also gave in pledge the 230 shares of the stock in question; that the note was duly protested at maturity for non-payment, and subsequently reduced by partial payments to the amount claimed; and thus reduced, *McCallop* became the owner thereof, on the 7th of January, 1847, by payment, and as such subrogated to all the rights of the bank as pledgee.   The executor thereupon prays that the stock be sold after due proceedings, and the proceeds applied by privilege and preference to the payment of his claim.

The answer to the intervention sets up as matter of defence that *McCalop* had assumed, and was bound under his agreements of the 28th of October, 1846, and 7th of February, 1848, to pay all the debts due by *F. M. Hereford* to the Union Bank; that he not only refused to fulfil his obligations, but violated the same by obtaining the control of those debts, and thereby procuring the forced alienation of *F. M. Hereford's* slaves, mortgaged to the bank at a great sacrifice, to wit: $9000, the difference between the price of adjudication and the real value thereof.   *F. M. Hereford* claims as damages in re-convention this amount, and also the sum of $5000 as the hire of said slaves.

Prescription is also pleaded in bar to the action of the intervenor.

On the 10th of March, 1848, *McCalop* brought suit against *F. M. Hereford* for the recovery of the balance due on the note, (in which the allegations are similar to those set forth in the intervention,) and therein prayed for judgment in his favor, with all the rights and privileges attached to the note as subrogee of the bank.   The plea of prescription is therefore unavailable.

The question which arises between the plaintiff and intervenor, and which is the principal question in the cause, is whether any right of pledge exists as

claimed by the latter; or, in other words, was there any subrogation, either conventional or legal, which resulted from the alleged payments. As to conventional subrogation, it is not pretended that any such ever existed, but it is insisted that there was a legal subrogation. Subrogation takes place of right in certain cases enumerated in the Code, one of which is, " for the benefit of him who being bound with others, or for others, for the payment of the debt, has an interest in discharging it;" Article 2157, § 3. The question thus presents itself, had *McCalop* such an interest? The record shows that *F. M. Hereford's* plantation and slaves were mortgaged to secure 230 shares of the capital stock of the Union Bank of Louisiana, and also a loan obtained thereon. On the 14th November, 1843, the plantation was sold by *F. M. Hereford* to *McCalop*, the former binding himself to give to the latter a guarantee against the mortgage of the bank. Subsequently, the bank having taken steps to obtain an order for the seizure and sale of the plantation, the proceedings were suspended at the request of *Hereford* to effect an arrangement, through *McCalop*, for the payment of the debt. Accordingly, on the 28th of October, 1846, the bank received of *McCalop* a draft on *J. B. Shaw & Co.* for the sum of $5000, payable on the 4th of January, 1847, the proceeds of which when collected were to be applied, first to the payment of the note, and the remainder thereof on account of the arrearages on *Hereford's* stock bond. In his written agreement with the bank, making this application, *McCalop* declares that he has assumed the payment of the stock loan, and that *Hereford* is to transfer the stock to him. This agreement appears to have been ratified by another of the 7th of February, 1848, in which *McCalop* declares that he has given to *Hereford* five years to pay the debt, the latter binding himself to transfer the stock to the former at a price to be fixed by *Messrs. Jacob & Frey*, the president and cashier of the bank, and to give him also a mortgage on the same slaves then mortgaged to the bank, whenever so required by *McCalop*. The transfer of the stock was not effected, owing, it would seem, to the disagreement of the parties as to the standard by which its value should be fixed, one of them contending that it should be according to its intrinsic value, and the other, its real value in the market. An attempt appears to have been made by *Hereford* to put *McCalop* in default. Subsequently, the slaves of the former, thus mortgaged, were seized and sold under executory process procured, it would seem, at the request of *McCalop*. After the sale of the slaves, the stock was seized and sold under the plaintiff's execution, as alleged by her.

Under these circumstances, it is evident that *McCalop*, in making the alleged payment, had not such an interest as that required by the section of the Article of the Code to which we have adverted, so as to give rise to a legal subrogation in his favor. According to the clear and explicit terms of his agreement with the bank, the draft of $5000 must be considered as given in payment, and not merely as collateral security as contended for.

The plea in reconvention set up by *F. M. Hereford* is not well founded. As a pre-requisite to the recovery of damages the debtor must be put in default; C. C., 1905, 1906; 3 R., 400. It is clear, under the circumstances, that *McCalop* could not have been put in delay. The stock was to have been transferred to him at a price to be fixed by the President and Cashier of the bank. No such price has ever been fixed. " It is of the essence of a sale that the price should be certain, fixed and determined by the parties. It may be left to the arbitration of a third person; but if such person cannot, or be unwilling to make the esti-

FORT
v.
UNION BANK.

mation, there exists no sale; C. C., 2439, 2440." In the absence of any specific price, it is clear that the promise of *Hereford* to transfer the stock to *McCalop* could not be carried into effect, and was therefore null and could give rise to no dam ges.

It is, therefore, ordered, adjudged and decreed that the judgment of the court below be affirmed, with costs in both courts.